MRS. W. M. MITCHELL, Administratrix, v. SOUTHERN RAILWAY COMPANY.

Eastern Section. ——— —, ——.

524

McMahan & Pierce, of Morristown and J. Frank Parks, of Jefferson City, for plaintiff in error.

Susong, Susong & Parvin, of Greeneville, Chas. H. Stevens and Jno. R. King, of Morristown, for defendant in error.

PORTRUM, J. The plaintiff sues the defendant to recover for the death of J. B. Jarnigan, an employee, for the benefit of his wife and child. Jarnigan, at the time of his injury, from which he died, was employed as a flagman and watchman and was stationed at Susong's Bluff on the line of the Southern Railway to watch for slides and fallen rocks upon the track, and to take measures to stop approaching trains in either direction. While engaged in this duty he was struck by a moving interstate train, Saturday night, June 10, 1928. This was a rainy night and the fog was so dense that one could see, with the aid of a light, only a distance of about ten feet. The track was constructed on the side of this overhanging bluff and on the banks of Nollichuckey River; the roadway was a comparatively new roadway, only having been constructed for five or six years, and during rainy weather the overhanging rock would become dislodged and fall upon the track, and the bank would sometimes slide, so that it was necessary that the railway company maintain a watchman at this point after rains and so long as the danger of slides and falling rock continued. The deceased was a member of a section crew that had this portion of the road under its supervision and upkeep; as a section hand he worked on the section crew during the day of eight hours, and when it rained he was assigned at night to flag this section of the roadway. He was required to work throughout the night if there was necessity for a watchman.

This new line of railroad ran from Bulls Gap, Tennessee to Leadvale, Tennessee and was constructed to shorten the distance between these two points and avoid the necessity of running through Morristown, which was at the apex of a triangle, the new line running upon the base. It was not used for passengers or local service, being only ten or fifteen miles long, but was used for the moving of interstate trains from the coal fields to the Carolinas and the south. One in-

terstate coal train passed over this track from Bulls Gap to Lead-
vale on the night of the accident, passing the place of the accident
at 10:35 p. m. The injured employee was not discovered upon the
right-of-way until 2:00 a. m. on Sunday morning. He was found
to be alive some time after. his discovery and finally was removed
to the hospital at M,orristown, Tennessee, where he died on the same
day. At the place of the accident the roadbed is upon a curve which
would tend to deflect the headlights of an approaching engine away
from the track and across the river; near this place there is a shoal
in the river which creates noise and tends to obscure noise made by
an approaching train.

On this Saturday night three young men of the neighborhood
had been out on a trip of pleasure; they were returning to their
home along the track near two o'clock in the morning, when they
came upon a hat in the middle of the track with two holes cut in it;
one of the boys picked up the hat and examined it and threw it over
on the bank. They paid little attention to the hat but when they
had proceeded only a few feet they came upon a human foot severed
from the body, between the rails of the track; a shoe was torn away
from the foot and lay a short distance from it; the boys became
agitated at this sight; one of them, who was carrying a flash-light,
flashed his light to the side of the track and near-by saw the body of
a man lying there. At this sight the three became greatly frightened
and excited and broke into a run down the track, the one carrying
the flash-light outstripping his companions in the race. They rushed
into the first house and informed the owners of their grewsome find,
and then they went to other places and informed others. They
described the man as a large powerful man. Within an hour these
men had gathered at the place of the accident and re-viewed the
body, which they thought to be a dead body. No one would touch
it. nor attempt to arouse the man in order to see if in fact he were
dead. The man was not a large man, as he had been described to be,
but was a tall, muscular man. While these men stood there in the.
early dawn looking at this injured man, with his head lying near the
end of the ties and his body broken and bleeding, he opened his
eyes and the spectators were aware that he was alive. They then
became exceedingly active and inquired of him if he wanted water;
he attempted to talk, but could not make himself understood, and
then indicated with his hands the places where he was injured by
pointing towards his shoulder and his foot—between his groans—
and a pillow was procured and he was placed upon a lever car and
removed to the hospital. His broken lantern was found a few feet
from the place where he was found. A butcher knife was lying
on the bank opposite him and a few cracker crumbs were on the
ground a short distance from him, which he may have dropped when

eating his midnight lunch. The tracks at this point were four feet from the bank of the high cliff of overhanging rock. On the opposite side of the bank was a dirt road and this road could have been used in safety for flagging trains had it not been for the dense fog which made it necessary for the flagman to cross the track and inspect it from that side; he had been instructed by his foreman to stay off of this four foot space between the bluff and the track in order to avoid dislodged overhanging rock. The foreman stated in case of a falling rock it would have been necessary for the employee to have crossed the track to inspect the place where the rock fell, though it is reasonable to infer that it was necessary to walk upon this side of the track and upon the track to see if there were any fallen rocks and at the same time avoid being hit by an overhanging rock. It is reasonable to say that at the time he was struck he was at a place where his duty called him to inspect the track, but this would not relieve him from his duty to look and listen for approaching trains. However, it was his duty to flag trains approaching from either direction and in the dense fog he may have been diligent in looking for a train approaching in one direction when he was hit by a train approaching from the other. The train crew did not see the flagman; they learned of the accident after they had travelled eighty-seven miles.

The circuit judge was of the opinion that the deceased's employment pertained to and had connection with interstate commerce, and the accident was one under the Federal Employer's Liability Act; he was of the further opinion that the employee assumed the risk of his employment. So, at the conclusion of the evidence of the plaintiff, and upon a motion made by the defendant for a directed verdict he sustained it. The circuit judge was in error in this if the defendant was precluded from relying upon the defense of assumption of risk; and it was precluded from relying upon this defense if it had violated any act of Congress made for the safety of the employee and the public generally, in event the violation proximately contributed to the injury. The declaration does not charge in express words that any statute made for the protection of the employee, or the public, was violated; however, the facts stated in the second count of the declaration show a violation of the hours of Service Act of Congress. This is sufficient. (For instance, Moore & McSerren v. Fletcher, 145 Tenn., 97, 236 S. W., 942.) Therefore, in our consideration of the assignment that there is no evidence to support the verdict, and that the judge erred in sustaining the motion for a directed verdict, we are confronted with this question. This calls for a partial construction of the act and a review of the evidence in the record pertaining to its violation:

"An act to promote the safety of employees and travellers upon railroads by limiting the hours of service of employees thereon.

(The first section of the act pertains to identification, and it is not necessary to define the jurisdiction.)

"Section 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act, to require or permit any employee subject to this act to be or remain on duty for a longer period than sixteen (16) consecutive hours, and whenever such employee of such common carrier shall have been continuously on duty for sixteen hours, he shall be relieved and not required or permitted to again go on duty until he has had at least ten consecutive hours off duty; and no such employee who has been on duty sixteen hours in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty;

"Section 3. (As amended May 4, 1916) (1) That any such common carrier, or any officer or agent thereof, requiring or permitting any employee to go, be or remain on duty in violation of such section thereof shall be liable to a penalty of not less than one hundred nor more than five hundred dollars for each and every violation, to be recovered in a suit or suits to be brought by attorneys in the District Court of the United States that has jurisdiction in the locality where such violation shall have been committed. . . ." (March 4, 1907, Chapter 2939, Section 1, 34 Statutes 1415.)

This statute is to be given a liberal construction.

"The hours of service act is a highly remedial statute, and although a penalty is provided for such violation, it should be liberally construed in order that its purpose may be effective, for the public as well as the employees themselves are vitally interested in its enforcement. Whereas the purpose of the statute is to prevent accidents to trains and consequent injuries to passengers and employees, it is the duty of the court to construe it liberally in order to accomplish the purpose of its enactment.

" 'The act is remedial and in the public interest, and should be construed in the light of a humane purpose.' " Roberts Federal Liability of Carriers (2 Ed.), volume 2, section 533, page 1070.

"The purpose of Congress in the enactment of the hours of service act was to prevent the dangers which must necessarily arise to employees and to the public from continuing men in a dangerous and hazardous business for a period as long as to render them unfit to give that service which is essential to the protection of themselves and those entrusted to their care; for it is common knowledge that the passage of this statute was induced by the many casualties in railroad transportation which resulted from requiring tired and exhausted employees to discharge the arduous duties of their em-

ployment. The statute recognizes that there is a limit to human endurance, that hours of rest and recreation are needed for the health and the efficiency of men engaged in railroading. 'In this legislation' said Judge Cook 'Congress had in view the many serious railroad accidents caused by the unfitness for duty of men engaged in, cr having to do with the movement of trains, who had endured a certain period of continuous, unbroken service, without intervals for rest. The remedy adopted was by limiting the maximum of the hours of service and the minimum for the intervals between. It was thought futile to attempt to control the employees in their use of their time off; therefore, it was deemed more tactful and efficient, if demand was made upon and confined to those who gave them employment in their regular occupation.' '' Id. Section 600.

Was this law violated? The deceased was required to work on the section crew eight hours each day and to work as watchman and flagman throughout the night following his day's work. The section crew ended its work for the day at four o'clock in the afternoon when the employee resumed work as flagman and watchman at seven o'clock in the evening. The men were given an hour off for dinner at the noon hour, which was not included in their time, and as a result they were upon the work nine hours in place of eight. The widow testified that her husband was required to fill both of these positions. She stated she objected to this but was not permitted to say more. The deceased worked as watchman during wet weather, and had worked two nights and days in succession. The foreman of the section crew, who was introduced as a witness by the plaintiff, testified that the deceased had been engaged in this work for a period of a year; he had worked on Friday and did not work Friday night, he reported for work at seven o'clock Saturday morning, and was dismissed from the section crew at three o'clock, but was given time until four, or the whole of eight hours; the section foreman states that the deceased had done extra work entitling him to this extra hour. When he quit work as a section hand he was directed to go upon the road as watchman at seven o'clock and to watch until twelve, and if the weather conditions justified he was to remain throughout the night as watchman and he was to be the judge of whether conditions required his continuing service. He was paid full time for his labor as a section hand and time-and-a-half for over-time as his services as a night watchman and flagman. His hours of service appears upon the time-books and the pay-rolls of the company, and did for a period of at least one year before the night of the accident. He had put in service for twenty hours in a period of twenty-four on repeated occasions; cn the night of the accident he was required to serve until twelve and from seven in the morning until twelve in the night made a

period of seventeen hours, and he was made to be the judge of whether it was his duty, because of weather conditions, to continue in the service until morning. He was shown to have been injured at 10:35, twenty-five minutes before the expiration of sixteen hours, counted from seven o'clock in the morning. However, he remained at his station of duty until he was discovered at two o'clock and until he was removed at about four o'clock in the morning, but he was incapacitated from performing further duties after the accident.

These facts make pertinent several inquiries: (a) Was the employee engaged in the actual movement of an interstate train or connected with the actual movement so as to bring him within the definition of an employee as contemplated by the act? (b) Did the fact that the employee was laid off between four o'clock in the afternoon (or three o'clock) and seven o'clock in the evening, together with the noon hour, break the continuity of his service? (c) Did the fact that the employee was injured twenty-five minutes before the expiration of the sixteen hour period on that particular night relieve the company from its violation of the act in requiring the employee to remain upon the work for seventeen hours and for a further period if the conditions of the weather required it?

(A) We think the deceased was actually engaged and connected with the actual movement of an interstate train, and within the definition of an employee as contemplated in the act. The fact that he was not engaged in the actual movement of an interstate train, or connected therewith, and that he was working as a section hand would not affect his status if at the time of his injury he was then engaged in connection with the movements of an interstate train. The statute was enacted to better insure the safety of those operating, or connected with the operation, of interstate trains, against physical exhaustion of those employed in the operation of the trains. It makes no difference if the employee was exhausted in other work if thereafter he had undertaken the work in connection with the movement of trains. The danger then immediately arose. The object was to guard against the dangers caused by the excessive employment of men, and the danger was there so long as an employee was required or permitted to engage in this service after the maximum of employment.

A watchman and flagman, stationed to guard against slides and falling rock on the track of a railroad used solely for the movement of interstate trains (as it is agreed in this case this track was used) is connected with the movement of interstate trains. The employee was supplied with a lantern, flags, torpedoes, and flares, and it was his duty in case of slides or falling rocks to place these warnings at each end of the track to stop approaching trains from either direction. His duties were as responsible as a sentinel for the protec-

tion of the lives of the train crew, and the property of the railroad which was endangered in moving across this stretch of track. A sentinel is shot who sleeps at his post of duty. This watchman was directly connected with the movement of an interstate train; the safety of the crew of the train depended upon his diligence, and the purpose of the act was to better insure the safety of the members of the train crew. In the absence of a watchman, the train ran through this section of the track on slow orders, to better protect the train. The train on this night was running on regular schedule and the service of the watchman increased the speed of the train, and his services proved as efficient as the coal or steam within the engine. or the engineer in making the time.

"When a train is side-tracked and the crew is laid off to rest because of the sixteen hour law, a fireman who thereafter remains on the engine for the purpose of keeping up the fire and steam and otherwise watching the engine is thereby actually engaged in or connected with the movement of the train within the meaning of the statute. Such work beyond the statutory period is, therefore, a violation of the act." (Northern Pacific v. United States, 130 C. T. A., 157, 213 Federal 577), Id. Section 607.

The flagman is a quite different employee from one engaged in the unloading of standing cars from interstate trains. Sthweig v. Chicago, Milw. & St. Paul Railway Co., 216 Federal, 750.

(B) "For the purpose of determining when an employee has been at work sixteen hours, as well as to determine whether his services come under the "continuing" or "hazardous" classification, it becomes necessary to consider the effect of their interruption of the work. Short periods off duty will not ordinarily affect the continuity of the service within the meaning of the law. 'The purpose of the statute is plain' said the court in the case cited 'and it must be so construed as to promote this policy. The hours of service of railway trainmen are long at best, leaving only eight hours for rest and recreation, and if this brief period can be broken into fragments the purpose and policy of the law will be entirely frustrated. If a train crew may be laid off for an hour and a half at one time to suit the convenience or necessity of the company, it may be laid off for a like period at another, and the members of the crew will be wholly deprived of any substantial time for either sleep or rest.'

" 'There were periods of relief, taken into consideration for the purpose of the law' says Judge HEYLAND, in a majority opinion, 'periods of rest or off duty which the law requires? If there were, then there was not in any case a longer period of service or on duty than sixteen consecutive hours; if, on the contrary, these periods were of such length that, although absolutely relieved from duty, the employee did not receive that rest which it was the policy of the

law to secure, then the periods of relief did not prevent the hours of service from being consecutive and the law was violated. . . . Had an employee been absolutely relieved from service is not of controlling importance if the time is so short or the opportunities for rest are so meager that for all practical purposes an employee does not have the opportunity for rest which the law requires. It was decided in Southern Pacific Company v. United States (Circuit Court Appeals, 9th Circuit), 222 Federal, 46, 137 C. P. A., 584, that where the breaks or intermissions in the hours of service are such as the law will recognize depends upon their character as periods of substantial rest, and that the question as to whether the periods of relief gave opportunity for substantial periods of rest was for the jury, under the evidence in each case.' '' Roberts Federal Liability of Carriers, Sections 604, and 605.

We think the facts of this case make a question for the jury to determine if the continuity in service was broken.

(C) The deceased, under the express terms of his employment, was directed and required to labor throughout the night, if weather conditions justified it and, regardless of weather conditions, he was directed to stay upon the work until twelve o'clock, or a period of seventeen hours. The fact that he was required to go upon the work and stay upon the work until twelve o'clock was a violation of this act. The act was violated by the railway company when its foreman, the man in charge of the employee, directed him to go upon the work and remain for this length of time. The violation takes place at the time of the order, and not at the expiration of the sixteen hours. When the company violaled this act, at that moment it forfeited its right to plead the defenses recognized under the Federal Employer's Liability Act, because this act specially denies the company this right in case it has violated the hours of service law. If this be true, and we think it is, then the company is not relieved of this violation and restored to its right by the fact that the deceased was injured twenty-five minutes under the expiration of the sixteen hour limit if the violation proximately contributed to the injury. The Act says: ''To require or permit an employee subject to this act to be or remain on duty;'' and the third section says any officer or agent of any common carrier ''requiring or permitting any employee to go, be or remain on duty.''

It was a question for the jury to determine if the violation of this act proximate contributed to the injury. Had the employee been permitted to quit work at the expiration of the sixteen hour period, or at eleven o'clock, he may have been more active in the preservation of his own life and the property of the company and the lives of his fellow employees, twenty-five minutes prior to the employment limit. A man with twenty-five minutes to work at the middle

of the night is more alert and active than the man who has the night before him; at least some men with reasonable minds may conclude from common experience, or the facts of this case, that he would have been more active had his employment ended at eleven and not continued throughout the night. This made the question one for the jury.

If the hours of service act were violated, the railway company could not rely upon the contributory negligence of the deceased nor the assumption of the risk. Federal Employee's Liability Act. April 22, 1908, Chapter 149, Sec. 1, C. Statutes 65.

The circuit judge committed error in not submitting this case to the jury; his judgment is reversed, and the case is remanded for a new trial, at the cost of the defendant in error.

Snodgrass and Thompson, JJ., concur.